UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-366 DSD

| | |
|---|---|
| UNITED STATES OF AMERICA, | **AMENDED INFORMATION** |
| Plaintiff, | 18 U.S.C. § 1343 |
| v. | |
| ASHA FARHAN HASSAN, | |
| Defendant. | |

THE UNITED STATES ATTORNEY CHARGES THAT:

At times relevant to the Information:

**A.   The Minnesota Early Intensive Development and Behavior Intervention ("EIDBI") Benefit (Autism Services)**

1. Autism spectrum disorder ("ASD" or "autism") is a neurological and developmental disorder that affects how people interact with others, communicate, learn, and behave.

2. Applied Behavior Analysis, sometimes called "ABA therapy," is a type of one-on-one behavioral therapy designed to help children on the autism spectrum develop social and emotional skills. ABA therapy seeks to improve social skills by rewarding and reinforcing positive behavior while discouraging negative behavior.

3. The Early Intensive Developmental and Behavioral Intervention ("EIDBI") benefit is a publicly funded Minnesota Health Care Program that offers medically necessary services to people under the age of 21 with autism spectrum disorder. The EIDBI benefit is available to Minnesota residents under the age of 21 who are on Medical Assistance, MinnesotaCare, or other qualifying health care

<u>United States v. Asha Farhan Hassan</u>

programs and who have been diagnosed with ASD. According to the Minnesota Department of Human Services ("DHS") website, the purpose of the EIDBI program is "to provide medically necessary, early and intensive intervention for people with ASD and related conditions."

4. The EIDBI benefit covers various treatment options for persons diagnosed with ASD and related conditions, including ABA therapy.

5. In order to qualify for the EIDBI benefit, a person must be under 21 years old; be diagnosed with ASD or a related condition; have had a comprehensive multi-disciplinary evaluation (CMDE) that establishes their medical need for EIDBI services; and be enrolled in a qualifying healthcare program, such as Medicaid.

6. The CMDE is used to develop the person's individual treatment plan (ITP). An ITP is a personalized, written plan of care that outlines the goals for the person and sets forth the specific interventions the person will receive based on their individually assessed needs.

7. EIDBI treatment services must be delivered under the supervision of a Qualified Supervising Professional (or "QSP") that is employed by the EIDBI provider. The QSPs supervise and manage all aspects of EIDBI services, treatment, and documentation, including supervising the medical providers that actually provide services. The QSP assumes full professional responsibility for the services provided by each supervisee, including the supervisee's actions and decisions.

**B.    The Federal Child Nutrition Program and Feeding Our Future**

8. The Food and Nutrition Service is an agency of the United States Department of Agriculture (USDA) that administers various federal child nutrition

United States v. Asha Farhan Hassan

programs, including the Summer Food Service Program and Child and Adult Care Food Program (together, the "Federal Child Nutrition Program").

9. The Minnesota Department of Education (MDE) administers the Federal Child Nutrition Program in Minnesota.

10. Meals funded by the Federal Child Nutrition Program are served by "sites." Each site participating in the Federal Child Nutrition Program must be sponsored by a sponsoring organization that is authorized to participate in the Federal Child Nutrition Program. Sponsors are required to submit an application to MDE for each site. Sponsors are responsible for monitoring each of their sites and preparing reimbursement claims for their sites.

11. Sponsors submit reimbursement claims to MDE on behalf of sites under their sponsorship. The USDA then provides federal reimbursement funds on a per-meal basis. MDE provides the federal funds to the sponsoring agency, which in turn pays the reimbursements to the sites under its sponsorship. The sponsoring agency retains 10 to 15 percent of the funds as an administrative fee in exchange for sponsoring the sites, submitting reimbursement claims, and dispersing the federal funds.

12. Historically, the Federal Child Nutrition Program has generally functioned by providing meals to children involved in educational-based programs or activities. During the Covid-19 pandemic, however, the USDA waived some of the standard requirements for participation in the Federal Child Nutrition Program. Among other things, the USDA allowed for-profit restaurants to participate in the program. The USDA also allowed for off-site food distribution to children outside of

United States v. Asha Farhan Hassan

educational programs. At the same time, the state government's stay-at-home order and telework policies made it difficult to oversee the program. These changes left the program vulnerable to fraud and abuse.

13. Feeding Our Future was a non-profit organization purportedly in the business of helping community partners participate in the Federal Child Nutrition Program. Aimee Bock was the founder and executive director of Feeding Our Future.

14. Prior to the onset of the Covid-19 pandemic, Feeding Our Future was a small non-profit that sponsored the participation of daycares and after-school programs in the Federal Child Nutrition Program.

15. Beginning in approximately April 2020, Feeding Our Future dramatically increased the number of sites under its sponsorship as well as the amount of Federal Child Nutrition Program funds received by those sites. Feeding Our Future went from receiving and disbursing approximately $3.4 million in federal funds to sites under its sponsorship in 2019 to nearly $200 million in 2021.

16. Bock oversaw a massive scheme to defraud the Federal Child Nutrition Program carried out by sites under the sponsorship of Feeding Our Future. Bock and Feeding Our Future sponsored entities that submitted fraudulent reimbursement claims and fake documentation while purporting to serve hundreds and, in many instances, thousands of children per day. Bock and her company sponsored the opening of nearly 200 Federal Child Nutrition Program sites despite knowing that the sites intended to and did submit fraudulent claims.

United States v. Asha Farhan Hassan

### C. Smart Therapy LLC

17. Defendant ASHA FARHAN HASSAN was the President and CEO of Smart Therapy LLC.

18. Smart Therapy was registered with the Minnesota Secretary of State in November 2019.

19. Shortly after forming the company, HASSAN enrolled Smart Therapy as a provider agency in the EIDBI program.

20. HASSAN also enrolled Smart Therapy in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future.

### Count 1
(Wire Fraud)

21. From in or about December 2020 through in or about 2025, the defendant,

ASHA FARHAN HASSAN,

and others known and unknown to the grand jury, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

22. More specifically, HASSAN used Smart Therapy to defraud two government benefit programs—the Federal Child Nutrition Program and the EIDBI program.

23. From in or about November 2019 through in or about December 2024, HASSAN used Smart Therapy to carry out a scheme to defraud the EIDBI program.

United States v. Asha Farhan Hassan

24. Shortly after forming Smart Therapy, HASSAN enrolled the company as a provider agency in the EIDBI program. HASSAN listed herself as the sole owner of Smart Therapy. In reality, other individuals also had ownership stakes in Smart Therapy but were not listed on DHS documents, including because one of the owners previously owned an adult daycare and was excluded by DHS for three years due to her conduct running the adult daycare center.

25. Smart Therapy purported to be providing necessary one-on-one ABA therapy to children with autism. In fact, Smart Therapy employed unqualified individuals as "behavioral technicians." These behavioral technicians were often 18- or 19-year-old relatives with no formal education beyond high school and no training or certifications related to the treatment of autism.

26. To run their fraud scheme, HASSAN and her partners needed children who had an autism diagnosis and an individual treatment plan. HASSSAN and her partners approached parents in the Somali community to recruit their children into Smart Therapy. Where a child did not have an autism diagnosis and an individual treatment plan, HASSAN and her partners worked with a QSP to get the recruited children qualified for autism services. There was no child that Smart Therapy was not able to get qualified for autism services.

27. As a recruitment tactic to drive up enrollment, HASSAN and her partners paid monthly cash kickback payments to the parents of children who enrolled their children to receive EIDBI services through Smart Therapy. These kickback payments ranged from approximately $300 to $1,500 per month, per child.

United States v. Asha Farhan Hassan

The amount of these payments was contingent on the services DHS authorized a child to receive—the higher the authorization amount, the higher the kickback.

28.     Often, parents threatened to leave Smart Therapy and take their children to other autism centers if they did not get paid higher kickbacks. Several larger families left Smart Therapy after being offered larger kickbacks by other autism centers.

29.     HASSAN and her partners submitted millions of dollars' worth of claims for Medicaid reimbursement on behalf of Smart Therapy. Many of these claims were fraudulently inflated, were billed without providers' knowledge, and were for services that were not actually provided.

30.     It was a further part of the scheme that HASSAN submitted claims seeking reimbursement for the maximum number of hours permitted by Medicaid for a given treatment or service given to a particular client, when the client only received a fraction of those treatment hours, if any treatment was provided at all on that day. These claims were then repeated for numerous other providers.

31.     Most of the children were dropped off in the morning and picked up in the evening by drivers, who billed DHS for transportation services. It was further a part of the scheme that some of these transportation providers were also on the payroll of Smart Therapy.

32.     It was a further part of the scheme that HASSAN also submitted claims for reimbursement to Medicaid that included fraudulent signatures or approvals from the required medical providers or supervising QSPs. In reality, the providers and QSPs either did not work for Smart Therapy, were out of the country on the day the

services were provided or had not participated in or signed off on the services listed in the claims.

33. HASSAN and her partners covered the cost of the kickback payments that Smart Therapy paid to parents through the fraudulent billings to Medicaid. HASSAN split the proceeds of the fraud schemes with her partners.

34. HASSAN'S fraudulent scheme resulted in Smart Therapy obtaining more than $14 million in EIDBI reimbursement funds from Minnesota DHS and UCare.

35. From in or about July 2020 through in or about January 2022, HASSAN also used Smart Therapy to defraud the Federal Child Nutrition Program by fraudulently claiming to have served free meals to hundreds of children.

36. HASSAN enrolled Smart Therapy in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future in July 2020.

37. Shortly after enrolling in the program, HASSAN began submitting fraudulent claims to Feeding Our Future. HASSAN fraudulently claimed that Smart Therapy was serving breakfast and lunch to exactly 300 children a day, 7 days per week.

38. HASSAN prepared and submitted fraudulent meal counts, attendance rosters, and invoices in support of the fraudulent claims.

39. HASSAN submitted fraudulent invoices purporting to show that a food vendor company called S & S Catering provided meals to be served at the Smart Therapy site.

United States v. Asha Farhan Hassan

40. By April 2021, HASSAN claimed to be serving approximately 1,200 meals per day to children, 7 days per week, at Smart Therapy.

41. Between 2020 and 2021, HASSAN claimed to have served nearly 200,000 meals to children at the Smart Therapy site, for which she claimed to be entitled to approximately $465,000 in Federal Child Nutrition Program funds.

42. HASSAN shared in the proceeds of the fraud scheme with the other owners of Smart Therapy. HASSAN sent hundreds of thousands of dollars in fraud proceeds abroad, some of which she used to purchase real estate in Kenya.

43. On or about June 23, 2021, in the State and District of Minnesota and elsewhere, the defendant,

ASHA FARHAN HASSAN,

for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, namely an email from HASSAN in Minnesota to Feeding Our Future containing meal counts and a roster that traveled through servers located outside the state of Minnesota,

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATIONS

44. The allegations in the Information are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c).

45. If convicted, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

United States v. Asha Farhan Hassan

Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to Count 1 of the Information.

    46.    If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c).


Dated: September 24, 2025                     JOSEPH H. THOMPSON
                                                    Acting United States Attorney


                                                    */s/ Rebecca E. Kline*
                                                    BY: REBECCA E. KLINE
                                                    Assistant United States Attorney